IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MICHELLE LYNN LOVE LANG, as Administrator of the Estate of Joel Edgar Love, Jr., (1) in her capacity as Administrator of said Estate, (2) as Assignee of Ketom Construction Company, Inc. d/b/a Southern Preservation Systems, (3) in her capacity as Administrator of the Whiting-Turner Contracting Company, (4) in her capacity as Administrator, as Assignee of The Seven Fifty Limited Partnership, and (5) in her capacity, as Administrator, as Assignee of The Cincinnati Specialty Underwriters Insurance Company, | : : : : : : : : : : : : : : : : : : : : | CIVIL ACTION NO.  1:19-cv-3902-AT |
|     Plaintiff, | : : | |
| v. | : : : | |
| FCCI INSURANCE COMPANY, | : : | |
|     Defendant. | | |

## **ORDER**

This disputed insurance coverage case involves injuries arising out of the accumulation of construction dust. In 2013, Mr. Joel Edgar Love Jr. ("Mr. Love"), an individual with end-stage emphysema, suffered breathing problems and was hospitalized after construction work outside his apartment produced clouds of dust that accumulated in his unit. As alleged, the construction work continued even after Mr. Love complained to the workers about the dust and its effect on his

health. Mr. Love then sued the building owner, the contractor, and later the construction company, in state court. The construction company was insured by Defendant FCCI Insurance Company ("FCCI") but FCCI denied coverage based on the Policy's "Total Pollution Exclusion." Mr. Love passed away before the state court suit concluded; however, Plaintiff Michelle Lynn Love Lang, the Administrator of his Estate, continued the suit which ultimately settled, resulting in a Consent Judgment. As a part of the settlement, Love Lang was assigned the rights to bring this suit on behalf of the construction company, the general contractor, the building owner, and another insurer that had provided subsequent insurance to the construction company.

In the present action, Plaintiff Love Lang, as Administrator of Mr. Love's estate and Assignee of the above-listed companies, sues FCCI for the proceeds of the insurance policy and for breach of contract for failure to defend and indemnify. Now before the Court, FCCI moves for partial summary judgment on Claims I, II, and III, arguing that the Policy's Total Pollution Exclusion bars coverage for the damages alleged by Love Lang in these counts. For the regrettable reasons below, the Court **GRANTS** Defendant's Motion for Partial Summary Judgment [Doc. 19].

## I.   Background[1]

Mr. Joel Edgar Love Jr.

This somber saga begins in 2013 with a construction renovation project at the Briarcliff Summit Apartments where Mr. Love resided at the time. Mr. Love, who had serious health problems including end-stage emphysema and only 20% lung function, moved into a newly renovated apartment at the Briarcliff Summit Apartments in or about August 2013. (Plaintiff and Defendant's Stipulated Facts ("Stipulated Facts"),[2] Doc. 18 ¶ 7; Plaintiff's Additional Statement of Material Facts ("Pl. SOMF"), Doc. 26-3 ¶ 5.) In August 2013, a construction crew working at the Apartments began removing a row of bricks outside the window of Mr. Love's apartment unit by drilling a row of holes in the grout between the bricks, and then cutting the holes together to remove the brick. (Stipulated Facts ¶ 8.) The work being done outside Mr. Love's apartment resulted in clouds of dust entering his apartment, causing him serious breathing problems. (*Id.* ¶ 9.)

Mr. Love and his longtime domestic partner complained to the construction crew and explained that the dust was causing Mr. Love respiratory difficulties, but the workers told him that there was nothing they could do to stem the tide of the dust. (Pl. SOMF ¶ 10.) As the clouds of dust continued to be pumped into his apartment, Mr. Love's breathing problems worsened; on August 5, 2013, he had a

---

[1] This statement does not represent actual findings of fact.  *In re Celotext Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.
[2] The Parties have stipulated to certain facts as alleged in the prior lawsuits, for the purposes of this Motion for Partial Summary Judgment. (*See* Doc. 18.)

"crash" and did not remember waking up that morning or the behavior he exhibited, and had to be resuscitated. (Stipulated Facts ¶ 10; PL. SOMF ¶ 12.) As a result, late on the night of August 5, 2013, into the early hours of August 6, 2013, Mr. Love was taken to the Emergency Room where he spent time in the Intensive Care Unit ("ICU") on a breathing tube, then remained in the hospital for several weeks and suffered additional respiratory problems when he returned home to the Briarcliff Apartments. (Stipulated Facts ¶ 11; Pl. SOMF ¶ 12.) Before returning to his apartment, Mr. Love enlisted a friend to caulk the baseboards of his apartment and run air filters to ameliorate the effects of the dust while the workers continued to work into September 2013. (Pl. SOMF ¶ 14.) Yet, after returning from the hospital, Plaintiff alleges that Mr. Love had greater difficulty breathing, his lung function dropped to 17%, and his quality of life and mental state worsened in his final years as a result of this experience. (Pl. SOMF ¶ 15.) Just less than two years later, Mr. Love later passed away, on June 7, 2015. (*Id.* ¶ 16.)

The Companies Involved in the Construction:

The construction work at Briarcliff Summit Apartments in August 2013 involved a number of companies. The Briarcliff Apartments, previously known as "The 750 Building," was owned by The Seven Fifty Limited Partnership ("Seven Fifty"). (*Id.* ¶ 6.) In August 2012, Seven Fifty contracted with a general contractor, The Whiting-Turner Contracting Company ("Whiting-Turner"), to perform renovations on the building to turn it into a modern and affordable apartment complex for the elderly and disabled persons who lived there. (Complaint, Doc. 1-

4

1 ¶¶ 6-7; Pl. SOMF ¶ 2.) Whiting-Turner then hired a subcontractor, Ketom Construction Company d/b/a Southern Preservation Systems ("Ketom") to perform certain renovation work including façade restoration.  (*Id.* ¶ 7.) Façade restoration was one of the primary lines of work of Ketom. (*Id.*)  The construction crew performing the work outside Mr. Love's window worked for Ketom. (Stipulated Facts ¶ 8.)

Defendant FCCI is a commercial insurer that issued an insurance policy ("the Policy") to Ketom. This Policy became effective July 1, 2013 and was intended to go through July 1, 2014, but was cancelled early on August 15, 2013. (*Id.* ¶¶ 1-3.) Ketom obtained a new insurance policy with The Cincinnati Specialty Underwriters Insurance Company ("Cincinnati"), effective upon the cancellation of the FCCI Policy on August 15, 2013. (*Id.* ¶ 4.)  The FCCI Policy at issue here first includes a duty to indemnify and defend Ketom, the insured, as follows:

> [FCCI] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

(FCCI Policy with Ketom, Doc. 18-1 at 95.) The Policy also includes certain exclusions for incidents that are not covered, including a "Total Pollution Exclusion." This Total Pollution Exclusion provides:

> **This insurance does not apply to: (1) "Bodily injury" or "property damage" which would not have occurred in whole**

**or part but for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of "pollutants" at any time**. (2) Any loss, cost or expense arising out of any: (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to the effects of "pollutants."

(*Id.* at 112) (emphasis added.) The Policy defines a "pollutant" as **"any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.** Waste includes materials to be recycled, reconditioned or reclaimed." (*Id.* at 109) (emphasis added.)

The Previous State Court Actions:

In October 2014, before he passed away, Mr. Love initiated a lawsuit in the State Court of Fulton County against Seven Fifty (the owner of the Apartment building), Whiting-Turner (the contractor), and others defendants, *see* Civil Action File No. 14EV002322J. (Doc. 18-2.) In this First Injury Litigation, Mr. Love alleged that the clouds of dust released by the construction and into his apartment caused him serious breathing problems, resulting in his ICU stay and worsened quality of life in his final years. (Stipulated Facts, ¶¶ 9-11.) Mr. Love's theory was one of negligence. He alleged that defendants knew or should have known that the dust was being pumped into his apartment and that they knew or should have known the dust was particularly dangerous to Mr. Love given his medical conditions. (*Id.* ¶ 12a.) Further, he asserted that the defendants were negligent in continuing the renovation work without attempting to mitigate the effects of the dust, even after

he complained about the dust and breathing difficulties it was causing him. (*Id.* ¶ 12b-12c.)

In the course of this First Injury Litigation, Whiting-Turner (the contractor) tendered its litigation defense to FCCI; FCCI initially responded that it would investigate whether FCCI's Policy provided coverage. (*Id.* ¶¶ 13-14.) Then, Whiting-Turner filed a third-party complaint against Ketom, the subcontracting construction company. (*Id.* ¶ 17.) Months later, in November 2015, FCCI denied defense coverage to both Whiting-Turner and Ketom, citing the Policy's Total Pollution Exclusion. (*Id.* ¶ 18.) As noted, Mr. Love passed away in June 2015. After he died, Plaintiff Love Lang, Administrator of his Estate, was substituted as plaintiff in place of Mr. Love. She dismissed the First Injury Litigation without prejudice on July 22, 2016. (*Id.* ¶¶ 16, 19-20.) Plaintiff Love Lang then filed a renewal action on July 29, 2016, the Second Injury Litigation.

Like in the first action, in this Second Injury Litigation, FCCI again denied defense coverage to Ketom based on the Total Pollution Exclusion clause of the insurance contract. (*Id.* ¶ 21.) After back-and-forth negotiations, Love Lang settled her claims in the Second Injury Litigation with Seven Fifty, Whiting-Turner, Ketom, and Cincinnati. (*Id.* ¶ 25-26.) As part of the settlement of the Second Injury Litigation, these putative insureds assigned their claims against FCCI, including for breach of contract, to Plaintiff Love Lang. (*Id.*) A Final Consent Judgment was entered in the Second Injury Litigation on July 5, 2018 in the total amount of $1,203,084.39, with one million for Lang Love's negligence claims; $174,565.40

for Love Lang's assigned claims for contractual indemnification, breach of contract, and breach of warranty on behalf of the putative insureds; $28,169.99 for pre-judgment interest on the assigned claims; $349.00 for court costs; and post-judgment interest as allowed by law. (*Id.* ¶ 27.)

In the Final Consent Judgment, the state court found that certain facts alleged by Plaintiff Love Lang were deemed admitted by Ketom and were therefore true. Among those facts, the court found that the dust Ketom allowed to enter and accumulate in Mr. Love's apartment was construction dust generated by the business operation of Ketom and the dust "did not contain any toxic or particularly harmful material, the dust did not contain within it any particular known irritants, contaminants, toxins or poisons, and the dust did not contain any lead or asbestos." (Consent Judgment, Doc. 25-1 at 10, ¶ m.)[3]  In addition, the Consent Judgment states that mere exposure to the dust "would not necessarily be dangerous and would not automatically result in injury to an individual with healthy lungs, and even Mr. Love was not injured merely by simple exposure to the construction dust." (*Id.* at 10-11 ¶ n.)

Instead, the state court found in the Consent Judgment that the actions of Ketom in allowing the dust to enter into and accumulate over a period of days in the confined space of Mr. Love's apartment without taking reasonable steps and precautions to prevent or mitigate this intrusion and accumulation of dust, in

---

[3] In the Consent Judgment, the court also noted that there were some inadmissible hearsay statements regarding the content of the particulates in the air but that "there is no proper evidence controverting Plaintiff's" allegations that the dust contained no toxic materials or pollutants. (*Id.*)

combination with Mr. Love's already severely impaired lung function, "formed a set of circumstances that was increasingly unsafe, dangerous and harmful to Mr. Love." (*Id*. at 11, ¶ o.) Further, according to the Consent Judgment, after Mr. Love complained, Ketom could have — but failed to — take reasonable steps to redirect the dust, minimize the amount of dust in the air, seal the intrusion points to the apartment, block the dust from entering the apartment, or clean/ remove any dust that did enter the apartment. (*Id*. at 11 ¶ p.) These failures caused the unsafe conditions that ultimately caused Mr. Love "to suffer hypercapnic respiratory failure, along with the trauma of slowly losing the ability to breathe and the hospitalization and recovery, and the physical and psychological suffering of increased permanent impairment of his lung function, decreased quality of life in his final years, and the psychological trauma of a fear and apprehension that his life may have been needlessly shortened." (*Id*.  at 11-12 ¶ q.)

The Present Action:

Fast-forwarding to the present case, Plaintiff Love Lang filed this action in Fulton County State Court in July 2019, in her capacity as Administrator of Mr. Love's estate and as Assignee of the claims of the several putative FCCI insureds. (Complaint, Doc. 1-1.) The suit alleges that FCCI had a contractual duty to defend and indemnify the putative insureds (Ketom, Whiting-Turner, Seven Fifty, and Cincinnati) in the underlying personal injury action and also brings a claim for proceeds of the FCCI policy to satisfy unsatisfied judgments against the allegedly insured companies, specifically Ketom. (*Id*.) In particular, the present suit asserts

the following claims: Count I for direct action for policy proceeds, Count II for breach of contract (duty to indemnify and pay); Count III for breach of contract (duty to defend); Count IV for breach of contract for defense costs; and Count V for attorney's fees and litigation costs. FCCI removed the case to this Court on August 29, 2019. (Doc. 1.)  Now, FCCI has filed a motion for partial summary judgment on Counts I, II, and III, arguing that the Policy's "Total Pollution Exclusion" bars those claims. (Doc. 19.) FCCI asserts that Claims IV and V are not yet ripe for resolution.

## II.   Legal Standard

Summary judgment may only be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." FED. R. CIV. P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting the Advisory Committee's note to FED. R. CIV. P. 56). "[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)  The burden then shifts to the non-movant to establish, by going beyond the pleadings, that there is indeed a

genuine issue as to the material facts its case. *Thompson v. Metro. Multi–List, Inc.*, 934 F.2d 1566, 1583 n.16 (11th Cir. 1991); *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). A dispute of material fact "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita*, 475 U.S. at 587.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992); *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). The Court must avoid weighing conflicting evidence. *Liberty Lobby*, 477 U.S. at 255; *McKenzie v. Davenport–Harris Funeral Home*, 834 F.2d 930, 934 (11th Cir. 1987). Nevertheless, the non-moving party's response to the motion for summary judgment must consist of more than conclusory allegations, and a mere "scintilla" of evidence will not suffice. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *Pepper v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989). But where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir. 1989). The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## III.  Discussion

### A.  The Total Pollution Exclusion

FCCI argues that it undisputedly owed no duty to defend or indemnify any of its putative insureds and that Plaintiff Love Lang is not entitled to policy proceeds and thus cannot recover on Counts I, II, or III. (Motion for Partial Summary Judgment ("Mot.") at 2.) There is no duty to defend or indemnify, according to FCCI, because the Policy's Total Pollution Exclusion bars coverage. (*Id*. at 10-15.) In response, Plaintiff Love Lang argues that the Total Pollution Exclusion is ambiguous, that application of the Total Pollution Exclusion here violates public policy, and that there is a question of fact as to the "but for" causation element outlined in the Exclusion. (Pl. Resp., Doc. 26 at 3.)

Under Georgia law, "[a]n insurance policy is simply a contract, the provisions of which should be construed as any other type of contract." *Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co*., 707 S.E.2d 369, 371 (Ga. 2011) (quoting *RLI Ins. Co. v. Highlands on Ponce*, 635 S.E.2d 168 (Ga. Ct. App. 2006)) (internal citations omitted). "Construction of the contract, at the outset, is a question of law for the court." *Id*. In construing the insurance contract, a court undertakes a three-step process, "the first of which is to determine if the instrument's language is clear and unambiguous." *Id*.; *see also, Reed v. Auto-Owners Ins. Co*., 667 S.E.2d 90, 92 (Ga. 2008) ("In construing an insurance policy, we begin, as with any contract, with the text of the contract itself."). "Where the contractual language unambiguously governs the factual scenario before the court,

the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured." *Reed*, 667 S.E.2d at 92. In undertaking this analysis, "[w]ords used in the policy are given their usual and common meaning, and the policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or attorney." *Ga. Farm Bureau Mut. Ins. Co. v. Smith*, 784 S.E.2d 422, 424 (Ga. 2016).

"However, if a provision of an insurance contract is susceptible of two or more constructions, even where multiple constructions are all logical and reasonable, it is ambiguous, and the statutory rules of contract construction will be applied." *Hurst v. Grange Mut. Cas. Co.,* 470 S.E.2d 659, 663 (Ga. 1996) (internal citation omitted). *See also, Auto-Owners Ins. Co. v. Neisler*, 779 S.E.2d 55, 59 (Ga. Ct. App. 2015) ("[C]ontractual provisions are ambiguous when they are 'susceptible to more than one meaning, even if each meaning is logical and reasonable.'") (citing *Michna v. Blue Cross and Blue Shield of Georgia, Inc*., 653 S.E.2d 377, 379 (Ga. Ct. App. 2007)).

In cases of ambiguity in insurance contracts, there are three well-known rules of construction that apply: "(1) ambiguities are strictly construed against the insurer as the drafter; (2) exclusions from coverage the insurer seeks to invoke are strictly construed; and (3) the contract is to be read in accordance with the reasonable expectations of the insured when possible." *Neisler*, 779 S.E.2d at 59. O.C.G.A. § 13-2-2 offers additional rules of contract interpretation and construction in the event a court determines that a contract is ambiguous. *See*

13

*Hurst*, 470 S.E.2d at 663. "Finally, only if the contract is still ambiguous after applying the rules of construction, 'the issue of what the ambiguous language means and what the parties intended must be resolved by the jury.'" *Neisler*, 779 S.E.2d at 60.

### i.   Whether dust is unambiguously a "pollutant" within the meaning of the Policy

Keeping in mind these core principles of contract construction in the context of an insurance agreement, the Court turns to the Policy at issue and its Total Pollution Exclusion. To refresh, the Total Pollution Exclusion precludes coverage for bodily injury "which would not have occurred in whole or part but for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (FCCI Policy with Ketom, Doc. 18-1 at 112.) The Policy further defines "pollutant" as "any solid, liquid, gaseous or thermal *irritant or contaminant*, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste." (*Id.* at 109) (emphasis added.)

Hence, the first issue before the Court is whether the construction dust at issue constitutes a "pollutant" within the meaning of the Policy, *i.e.*, whether the dust is a "solid, liquid, gaseous or thermal irritant or contaminant" akin to the listed examples: smoke, vapor, soot, *etc.* Whether a given substance is covered by an insurer's pollution exclusion has become a recurring issue in Georgia state and federal courts. Consequently, there is ample authority addressing questions like the one now before the Court. *See Sullivan v. Everett Cash Mutual Insurance Co.*,

14

2019 WL 3808465, at *8 (N.D. Ga. Apr. 17, 2019) (Murphy, J.) (explaining that "[p]rovisions of this type have become a boilerplate term in many of today's insurance contracts .... As a result, there is a notable body of Georgia case-law interpreting 'pollution exclusions' that are worded identically to the one at issue here.") Indeed, the language of the Policy at issue here is identical to the language of the policies in most of the Parties' cited cases.

In support of its position that the construction dust unambiguously constitutes a "pollutant" here, thereby precluding coverage, FCCI relies first on the Georgia Supreme Court's decision in *Reed v. Auto-Owners Ins. Co.*, 667 S.E.2d 90 (Ga. 2008). In *Reed*, a plaintiff tenant sued her landlord, alleging that she suffered bodily injury from the release of carbon monoxide gas in her rental house. *Id.* at 91. The landlord's insurer disclaimed coverage based on the policy's pollution exclusion, the language of which is identical to the language in the Policy here. *Id.* Affirming the Georgia Court of Appeals, the Georgia Supreme Court held that the carbon monoxide was an "irritant or contaminant" within the meaning of the policy, explaining:

> We need not consult a plethora of dictionaries and statutes to conclude that [carbon monoxide] is [an irritant or contaminant]. After all, the very basis for [the tenant's] lawsuit is her claim that the release of carbon monoxide gas inside the rental house "poisoned" her, causing her to suffer difficulty breathing, dizziness, insomnia, vomiting, nausea, headaches and decreased appetite. Accordingly, we agree with the Court of Appeals that the plain language of the pollution exclusion clause excludes [the tenant's] claim ... from coverage under the [landlord's] policy.

*Id.* at 92.

The Georgia Supreme Court subsequently reinforced *Reed* and its reasoning in *Georgia Farm Bureau Mut. Ins. Co. v. Smith*, 784 S.E.2d 422 (Ga. 2016), where it addressed a pollution exclusion issue involving whether lead paint was a "pollutant" under an identical exclusion clause.[4] There, the plaintiff alleged that her daughter suffered lead poisoning and permanent injury from ingestion of lead-based paint found on the premises of the house she rented. *Id*. at 426. Earlier in the litigation, the Georgia Court of Appeals determined that the facts were distinguishable from those of *Reed* and held that the language of the pollution exclusion did not unambiguously apply to lead paint. *See* 771 S.E.2d 452 (Ga. Ct. App. 2015). Reversing the Court of Appeals' decision, the Georgia Supreme Court held that "lead present in paint unambiguously qualifies as a pollutant and that the plain language of the policy's pollution exclusion clause thus excludes [plaintiff's] claims against [her landlord] from coverage." *Id*. at 426. The *Smith* Court endorsed an expansive interpretation of pollution exclusions, noting that "Georgia courts have enforced absolute pollution exclusion clauses without requiring that the pollutant at issue be explicitly named in the policy." *Id*.; *See also, Truitt Oil & Gas Co., Inc. v. Ranger Ins. Co.*, 498 S.E.2d 572, 574 (Ga. Ct. App. 1998) (finding that

---

[4] In *Smith*, the court explained that these absolute pollution exclusions were originally developed by commercial insurers in the 1960s and 1970s in response to environmental regulations which exposed them to greater liability for mass environmental claims and the first exclusion clauses were directed at only environmental pollution claims. *Id*. at 425. But in the mid-1980s, insurers revised the policies to encompass non-environmental pollution claims, substantially broadening the clauses' application. These revised provisions are known as "absolute" or "total" pollution exclusions. *Id*.

gasoline unambiguously fell within the policy's meaning of pollutant even where the policy did not specifically list gasoline).

Federal courts applying Georgia law have similarly interpreted pollution exclusion clauses broadly to find that substances were covered "pollutants," either in the context of "bodily injury," as here, or "property damage." *See e.g., Recyc Sys. Se., LLC v. Farmland Mut. Ins. Co.,* No. 4:17-CV-225 (CDL), 2018 WL 2247247, at *2 (M.D. Ga. May 16, 2018) (Land, J.) (finding that "noxious odors" were "pollutants" under similar policy language, in context of property damage); *Essex Ins. Co. v. H & H Land Dev. Corp*., 525 F .Supp. 2d 1344, 1353 (M.D. Ga. 2007) (finding that storm water runoff and resulting sediment were "pollutants" (*i.e.*, "irritants or contaminants") in connection with property damage claims) (citing *Owners Insurance Co. v. Lake Hills Home Owners Association, Inc*., 57 F.App'x 415 (11th Cir. 2002) (unpublished) (defining "irritant" as "anything that annoys" and "contaminant" as "something that makes impure or suitable by contact or mixture with something unclean, bad, etc.")). *See also, Evanston Insurance Company v. Sandersville Railroad Company*, 761 F.App'x 940, 942 (11th Cir. 2019) (affirming that welding fumes was "pollutant" under pollution exclusion).

One district court case specifically concerns the substance at issue here: dust. *See, Sullivan v. Everett Cash Mut. Ins. Co.*, 2019 WL 3808465 (N.D. Ga. Apr. 17, 2019) (Murphy, J.). In *Sullivan*, the court determined that, under the relevant legal authority, which required the court to read the language of the pollution

17

exclusion broadly, "airborne particulates *and dust*" from a poultry plant fell "well within the definition of pollutant," even though those substances were not listed in the policy. *Id*. at *9. (emphasis added).

Countering Defendant's cited legal authority, Plaintiff Love Lang relies on two cases with favorable holdings, both with tragic facts, neither binding precedent. (Pl. Resp. at 9-12.) In *Barrett v. Nat'l Union Fire Ins. Co*., 696 S.E.2d 326 (Ga. Ct. App. 2010), the plaintiff, an employee of a contracting company that installed natural gas, entered an excavation ditch to retrieve a gas plug and conducted work in the ditch for nearly two hours while covered by a rain poncho (to protect from the sunlight glare, which would have hindered his ability to use a "looking glass" tool). *Id*. at 328. Over the course of the two hours, the natural gas accumulated under the poncho, creating an oxygen-deprived atmosphere, ultimately causing the plaintiff to suffer a permanent and disabling brain injury. *Id*. The relevant insurer disclaimed coverage based on the policy's pollution exclusion provision, which defined "pollutant" under the same terms as here. *Id*. at 329. Explicitly declining to apply the Georgia Supreme Court's holding in *Reed*, the Court of Appeals in *Barrett* held that:

> There is nothing in the current record showing that natural gas is generally defined or viewed as an irritant or contaminant. Indeed, the allegations of the complaint indicate that exposure to natural gas is not necessarily dangerous and does not automatically result in injury so long as the supply of oxygen is not impeded. In the absence of any such evidence, we have no basis for concluding that natural gas is a pollutant under the terms of the Policy.

*Id.* at 330. In addition to finding that natural gas was not unambiguously a "pollutant" under the terms of the policy, the *Barrett* Court bolstered its decision by finding that it would violate public policy to allow the insurer to sell a liability policy to cover a company whose main product is natural gas when that policy contains an exclusion for damages resulting from such natural gas:

> Georgia public policy disfavors insurance providers insurance provisions that "permit [] the insurer, at the expense of the insured, to avoid the risk for which the insurer has been paid" and for which the insured reasonably expects it is covered. *Davis v. Kaiser Foundation Health Plan of Ga.*, 521 S.E.2d 815 (Ga. 1999). *See also Ga. Farm Bureau Mut. Ins. Co. v. Meyers*, 548 S.E.2d 67 (Ga. Ct. App. 2001) ("[w]hile insurance is a matter of contract, not sympathy, the policy is to be construed liberally in favor of the object to be accomplished"); *Anderson v. Southern Guaranty Ins. Co. of Ga.*, 508 S.E.2d 726 (Ga. Ct. App. 1998) ("insurance contracts are to be construed in accordance with the reasonable expectations of the insured") ...

*Id.* at 330-331. In a secondary holding (which the Court addresses further *infra*), the *Barrett* Court also found that a question of fact existed as to whether the pollution exclusion applied, regardless of whether natural gas was a "pollutant" because the record raised a question as to whether the plaintiff's injuries "arose out of" the "discharge, dispersal, seepage, migration, release, or escape of natural gas." *Id.* at 331.

The second case Plaintiff propounds is *Evanston Insurance Company v. Xytex Tissue Services, LLC*, 378 F. Supp. 3d 1267 (S.D. Ga. 2019). That case involved an accident at a storage facility for biological materials, including tissue. Xytex, the storage company, used cryogenic storage freezers cooled by a liquid

nitrogen delivery system but when the pressure in the nitrogen delivery system exceeded certain limits, liquid nitrogen was released into the warehouse and vaporized into nitrogen gas. *Id.* at 1275. On this unfortunate occasion, for various alleged reasons, the warehouse's oxygen level dropped, triggering an oxygen sensor alarm, and the accumulation of nitrogen formed a dense fog that set off the warehouse's motion detector and burglar alarm. *Id.* A sheriff's deputy responded to the alarms and died as a result of the oxygen-deprived atmosphere. *Id.* Xytex's insurer disputed its duty to indemnify and defend Xytex. *Id.*

In assessing whether nitrogen was a "pollutant," the *Xytex* Court explained that even under the insurer's chosen definitions of "irritant" (as "anything that annoys") and "contaminant" (as "something that makes impure or unsuitable by contact or mixture with something unclean, bad, *etc.*"), nitrogen was not unambiguously a "pollutant," because:

> The Parties agree that nitrogen is present in large quantities in the ambient air. (St. of Mat. Facts, ¶ 13; Resp. to St. Mat. Facts, ¶ 13.) On the one hand, if nitrogen is inhaled in large quantities, with no adverse effect, it cannot be said to annoy. On the other hand, if it can create an oxygen-deprived environment leading to asphyxiation, the Court understands how nitrogen could be considered something that annoys. Contaminant also yields multiple interpretations. If nitrogen was an unclean or bad substance, the human population would be unable to inhale the substance in such large quantities. Similarly, the air is not considered unclean or impure because it contains nitrogen. However, in an enclosed environment, it is possible to interpret that nitrogen makes the air unsuitable for breathing by forcing down the oxygen concentration. With multiple, plausible interpretations, "irritant" or "contaminant" do not decidedly encompass vaporized liquid nitrogen.

*Id.* at 1287. After determining that the language of the exclusion was ambiguous, the court applied the three well-known rules of construction, construing the ambiguities against the insurer, construing the exclusion narrowly, and reading the contract in accordance with the reasonable expectations of the insured. *Id.* at 1288. Xytex, which was in the business of storing tissue at low temperature using liquid nitrogen, reasonably expected that liability related to a nitrogen leak would be insured. *Id.* at 1288-89. Finally, like the Court in *Barrett*, the *Xytex* Court found that there was also a question of fact on causation: that is, whether the release of nitrogen was a "but for" cause of the bodily injury (and death) that occurred, as "several actions" attributed to Xytex were alleged to have caused the injury. *Id.* at 1290.

Here, under the binding Georgia Supreme Court precedent of *Reed* (finding carbon monoxide a "pollutant") and *Smith* (finding lead paint a "pollutant"), the Court must look first *only* to the plain language of the clause itself and cannot consider other sources of interpretation. *See Smith*, 784 S.E.2d at 425 (explaining that "[i]n construing the absolute pollution exclusion in *Reed*, this Court refused to adopt an approach which considered the purpose and historical evolution of pollution exclusions before looking to the plain language of the clause itself .... a focus on extra-textual sources of interpretation led the dissenters in *Reed* to find ambiguity in the pollution exclusion clause where none existed"). The Court also cannot apply rules of contract construction — construing against the drafter, strictly construing exclusions, or reading the contract in accordance with the

insured's expectations — absent ambiguity. *Sandersville Railroad*, 761 F.App'x at 943.

Looking only to the plain language of the pollution exclusion clause at issue, and reading the policy "as a layman would," the Court concludes that dust is a "pollutant" under the "broad definition contained in [FCCI's] policy." *Smith*, 784 S.E.2d at 426. The Georgia Supreme Court did not define the terms "irritant" or contaminant" in either *Reed* or *Smith*. Other courts have suggested that an "irritant" is "anything that annoys" and that a contaminant is "something that makes impure or unsuitable by contact or mixture with something unclean, bad, etc." *See e.g., Xytex*, 378 F. Supp. 3d at 1287; *Lake Hills*, 57 F.App'x at 415 (unpublished). A review of dictionary definitions lends similar results. *See Irritant*, Cambridge Online Dictionary (last accessed Mar. 28, 2021) (defining "irritant" as "something that causes trouble or makes you annoyed," "a substance that makes part of your body sore or painful," or "a cause of an uncomfortable physical reaction");[5] *Contaminant*, Cambridge Online Dictionary (last accessed Mar. 28, 2021) (defining "contaminant" as "a substance that makes something less pure or makes it poisonous" or "a substance that pollutes, spoils, or poisons something")[6].

---

[5] *See also, Irritant*, Online Oxford Advanced Learner's Dictionary, (last accessed Mar. 28, 2021) (defining "irritant" as "a substance that makes part of your body sore" or "something that makes you annoyed or causes trouble"); *Irritant*, Dictionary.com (last accessed Mar. 28, 2021) (defining "irritant" as "Physiology, Pathology. **A biological, chemical, or physical agent that stimulates a characteristic function or elicits a response, especially an inflammatory response.**") (emphasis added).

[6] *See also*, *Contaminant*, Online Oxford Advanced Learner's Dictionary, (last accessed Mar. 27, 2021) (defining "contaminant" as "a substance that makes something impure").

Under any of these constructions, "a cloud of dust," even absent toxicity or other impurities, is a substance that was an "irritant" and a "contaminant" to Mr. Love and his respiratory system.  This conclusion is plain upon a reading of the complaint, which contains allegations that Ketom's construction work "resulted in clouds of this construction dust entering into and accumulating in [Mr. Love's] apartment, causing him serious breathing problems." (Compl. ¶ 10.) Similarly, in the First Injury Litigation, Mr. Love alleged that the clouds of dust from the construction were pumped into his apartment, causing him serious breathing problems, and that the dust continued to be pumped into his apartment and that he continued to have difficulty breathing as a result. (Stipulated Facts ¶¶ 9, 10.) Further cutting against Plaintiff's position is the fact that another court in this district previously determined that "airborne particulates and dust" were "pollutants" under the same policy language. *See Sullivan v. Everett Cash Mut. Ins. Co.*, 2019 WL 3808465, at *9 ("The phrase 'any solid ... irritant or contaminant' plainly includes dust and any other particles emitted by a poultry plant, even if those substances are not explicitly listed in the Policy.")

Additionally, although not applying Georgia law, other federal courts addressing this issue have concluded that dust is a pollutant under similar or identical contract language. *Certain Underwriters At Lloyd's of London v. NFC Mining, Inc.*, 427 F. App'x 404 (6th Cir. 2011) (applying Kentucky law, finding that coal dust was a solid irritant to the eyes, nose, or lungs and was therefore a "pollutant" under identical policy language); *Devcon Intern. Corp. v. Reliance Ins.*

*Co.*, 609 F.3d 214 (3d Cir. 2010) (applying Virgin Islands law, finding that construction dust that allegedly caused personal and property damages, including breathing disorders, was a "pollutant" under policy); *Clarendon America Ins. Co. v. Bay, Inc.*, 10 F. Supp. 2d 736 (S.D. Tex. 1998) (applying Texas law and finding that dust (among other substances like sand, cement, and gravel) that was released from construction was a "pollutant" under identical pollution exclusion where plaintiffs alleged injuries to lungs and respiratory systems); *Allied Prop. And Cas. Ins. Co. v. Zenith Aviation, Inc.*, 336 F. Supp. 3d 607, 312 (E.D. Va. 2018) (applying Virginia law, finding that concrete dust from construction was "clearly a pollutant since it can undoubtedly function as both an 'irritant' and a 'contaminant,'" in the context of property damage).

Urging the Court to find ambiguity, Plaintiff Love Lang points to the notable absence of the word "dust" from the Policy's listed examples of "pollutants" — which includes "smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste." (Pl. Resp. at 12.) But this argument was explicitly foreclosed by the Georgia Supreme Court in *Smith* and is therefore unavailing. *Smith*, 784 S.E.2d at 425 ("Moreover, Georgia courts have enforced absolute pollution exclusion clauses without requiring that the pollutant at issue be explicitly named in the policy.")

Love Lang also relies heavily on the Georgia Court of Appeals decision in *Barrett*, where the court found that natural gas was not conclusively an "irritant" or "contaminant," and distinguishing the prior Supreme Court's holding in *Reed*. *Barrett*, 696 S.E.2d at 330. ("[Reed's] limited, fact-specific holding does not

support the conclusion that the subject pollution exclusion bars coverage for the Barretts' claims under the facts of this case.") Yet, *Barrett* is both factually distinct from the present case and also less persuasive in light of the Georgia Supreme Court's more recent (and binding) decision in *Smith* which only reinforced the holding in *Reed*. In *Smith*, the Supreme Court reversed the lower court that had attempted to distinguish *Reed* on the facts (exactly what the *Barrett* Court did):

> Because our decision in *Reed* controls the manner in which pollution exclusions in [commercial general liability] policies are to be construed by the courts of this State, the Court of Appeals erred in failing to apply this Court's analysis in *Reed* to the facts of this case.... As in *Reed*, we find the contractual language of [the] policy unambiguously governs the factual scenario in this case. Accordingly, the Court of Appeals was required to simply apply the terms of the contract as written.

*See Smith*, 784 S.E.2d at 425. ("In interpreting the insurance policy's provisions, the Court of Appeals had 'no more right by strained construction to make the policy more beneficial by extending the coverage contracted for than they would have [had] to increase the amount of the insurance.'"). Indeed, in bolstering *Reed*, the *Smith* Court emphasized the "broad" reach of the total pollution exclusion's language. *Id*. at 426. On top of this, *Barrett* involved natural gas, not dust, and the court determined that nothing in the record showed that natural gas was defined or viewed as an "irritant or contaminant." *Barrett*, 696 S.E.2d at 330. In light of the expansive interpretation of the pollution exclusion detailed in *Smith,* the

25

Georgia Supreme Court's most recent case on this issue, and the factual differences at play, *Barrett* does not provide Plaintiff with legs to stand on.[7]

The Court next turns to Love Lang's arguments concerning the state court Consent Judgment, which includes that the dust "did not contain any toxic or particularly harmful material, the dust did not contain within it any particular known irritants, contaminants, toxins or poisons, and the dust did not contain any lead or asbestos." (Pl. Resp. at 14) (citing Consent Judgment, at 10.) But as FCCI points out, Georgia law does not require the substance at issue, dust here, to contain industrially recognized toxins or poisons to fall within the definition of "pollutant." *See Smith*, 784 S.E.2d at 425 ("Expressly rejecting the notion that a pollution exclusion clause is limited to industrial and/ or environmental harm, Georgia courts have repeatedly applied these clauses outside the context of traditional environmental pollution.") (citing *Perkins v. Hardwood Lumber Co. v. Bituminous Cas. Corp.*, 378 S.E.2d 407 (Ga. Ct. App. 1989)) (finding smoke emanating from insured's premises to be an "irritant or contaminant" and thus a pollutant which caused bodily injury). *See also, Truitt Oil*, 498 S.E.2d at 573 (finding gasoline that caused property damage was a pollutant under the policy);

---

[7] Similarly, *Xytex* involved nitrogen, not dust.  The *Xytex* Court relied on evidence that nitrogen was benign and exists in ambient air without harm to humans.  378 F.Supp.3d at 1287. And while Plaintiff may dispute non-toxic dust's inherent ability to irritate more generally, the alleged "clouds of dust" undoubtedly irritated here, as the crux of Mr. Love's harm flowed from the dust's effects on his breathing capacity and respiratory functioning. *See Reed*, 667 S.E.2d at 92 (explaining that the court did not need to look to dictionary or statutory definitions where the allegations were that the substance caused difficulty breathing, dizziness, insomnia, and more). As such, *Xytex* cannot bolster Plaintiff's claims.

*Sullivan*, 2019 WL 3808465 (N.D. Ga. Apr. 17, 2019) (finding that "airborne particulates *and dust*" from a poultry plant were "pollutants").

Finally, plaintiff contends that it would violate public policy to allow FCCI to sell a general liability policy to a construction company that contains an exclusion for damages from dust, an everyday effect of construction. (Pl. Resp. at 16-17) (citing *Barrett*, 696 S.E.2d at 330-331) (finding that it would violate public policy to allow insurer to sell policy to cover Atlanta Gas Light, whose main product is natural gas, where the policy excluded coverage for damages from natural gas).

While the Court agrees with this general sentiment and acknowledges the disparate bargaining power often at play in these contract purchases, public policy cannot salvage Love Lang's claims. In *Barrett,* the only case Plaintiff cites for this proposition, the Court justified its public policy finding by relying on rules of contract construction in circumstances of ambiguity. Specifically, the court reasoned that contracts should be "construed liberally in favor of the object to be accomplished," that "insurance contracts are to be construed in accordance with the reasonable expectations of the insured," and that insurance contracts should be construed against the drafter. *Id.* But, as noted above, where the language is unambiguous, "[c]anons of interpretation used to resolve ambiguity simply do not apply." *Sandersville*, 761 F.App'x at 944 ("The insured's reasonable expectations come into play only when contractual language is ambiguous."). *See also, Smith*, 784 S.E.2d at 424 ("Where the contractual language is explicit and unambiguous,

'the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured.'")

"This is so because Georgia law permits an insurance company to fix the terms of its policies as it sees fit, so long as they are not contrary to the law, thus companies are free to insure against certain risks while excluding others." *Smith*, 784 S.E.2d at 424 (internal citations omitted). Georgia courts have indicated that "[a] contract cannot be said to be contrary to public policy unless the General Assembly has declared it to be so, or unless the consideration of the contract is contrary to good morals and contrary to law, or unless the contract is entered into for the purpose of effecting an illegal or immoral agreement or doing something which is in violation of the law." *Dep't of Transp. v. Brooks*, 328 S.E.2d 705, 713 (Ga. 1985); *N. Georgia Petroleum Co. v. Federated Mut. Ins. Co.*, 68 F. Supp. 2d 1321, 1327 (N.D. Ga. 1999) (O'Kelly, J.) ("Under Georgia law, an exclusion in an insurance contract is unenforceable because it violates public policy only if the legislature has statutorily mandated that an insurance contract provide that particular coverage). Here, Plaintiff has provided no grounds for the Court to find that the Policy's pollution exclusion is unenforceable for violating public policy.

The Court is sympathetic to Plaintiff's position and the circumstances of this case. Yet, dust is inescapably and unambiguously a "pollutant," *i.e.*, an "irritant or contaminant" under the circumstances here where Plaintiff has alleged that the dust, whether due to its accumulation or otherwise, caused Mr. Love's difficulty breathing and ultimate ICU visit. In upholding their relevant pollution exclusions,

*Reed* and *Smith*, the binding authority on this question, paint with a broad brush. Indeed, the majority opinion in *Reed* (and again in *Smith*) expressly rejected the dissent's more limited view of pollution exclusion clauses. In dissent, Justice Hunstein wrote:

> When viewed in isolation, the terms "irritant" and "contaminant" are "virtually boundless, for there is no substance or chemical in existence that would not irritate or damage some person or property." *Regional Bank of Colorado v. St. Paul Fire and Marine Ins. Co.*, 35 F.3d 494, 498 (10th Cir. 1994) (carbon monoxide from residential heater not within meaning of pollution exclusion) .... In short, as construed by the majority, the pollution exclusion functions as a gaping loophole into which the insurer can seek haven in situations in which no reasonable insured would have envisioned the exclusion to apply.

*Reed*, 667 S.E.2d at 93. (Hunstein, P.J., dissenting). Alas, this compelling perspective is not the law. The sizable body of legal authority addressing this issue and the harrowing facts of so many of the relevant cases illustrate the problems created by such an expansive, absolute carve-out in commercial general insurance policies. Legislative solutions may one day address this "gaping loophole." Until that time, however, the Court's hands are tied.

### ii.   Whether the release of dust was a "but for" cause of Mr. Love's injuries

Independently of whether dust is unambiguously covered under the language of the Pollution Exclusion, Plaintiff Love Lang argues that the Total Pollution Exclusion is inapplicable because FCCI has not established a "but for" causal link between any "discharge, dispersal, seepage, migration, release or escape" of dust and Mr. Love's bodily injury. (Pl. Resp. at 21.) Essentially, Plaintiff

argues that the acts or omissions of Ketom caused Mr. Love's injuries, not because Ketom caused the release of the dust, but because it "allowed the dust to enter and accumulate over a period of days in the confined space" without taking steps to prevent or mitigate the accumulation of the dust. (*Id.* at 20.) In response, FCCI argues that "[b]ut for the construction dust, Mr. Love's personal injuries would not have even partly occurred" and that "all of the damages were because of bodily injury alleged to have been caused by the dust." (Def. Reply at 11, 14.)

As noted briefly above, the courts in both *Barrett* and *Xytex* denied summary judgment in part based on the existence of fact questions as to whether the injuries at issue arose out of the "discharge, dispersal, seepage, migration, release, or escape" of the alleged pollutant. *See Barrett*, 696 S.E.2d at 331; *Xytex*, 1290. The *Barrett* court first noted that it was construing the exclusion narrowly and in favor of the insured and against the drafter-insurer before finding that the record did not show that the natural gas alone caused the injury, stating:

> In short, the allegations of the complaint show that Barrett could have worked safely in the presence of the gas; that the release of the gas, without more, did not injure Barrett; and that the injury to Barrett would not have occurred but for the negligence of the AGL employees.

*Barrett*, 696 S.E.2d at 332 (contrasting with other cases where "it was the mere presence of the pollutant, following its release, dispersal, or seepage that was the 'but-for' cause of the plaintiff's injury."). The *Xytex* court similarly reasoned that the "record demonstrates that whether the release of nitrogen was a partial but for cause of the injuries is in dispute because nitrogen is naturally harmless" and

because "several actions" attributable to Xytex beyond the release of the liquid nitrogen were alleged to have caused the deputy's death. 378 F. Supp. 3d at 1290.

Here, the Policy states that the insurance "does not apply to: (1) "Bodily injury" ... which would not have occurred in whole or part but for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (FCCI Policy with Ketom at 112.) The question is therefore: has FCCI shown as a matter of law that Mr. Love's alleged injuries would not have occurred in whole or part "but for" the release of the dust?

Based on the record and pleadings before the Court, Mr. Love's breathing problems and resultant hospital stay would not have occurred but for — that is, in the absence of — the release of the dust, regardless of the alleged negligent acts of the Ketom workers. *See University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 346-47 (2013) (describing "but for" to mean "in the absence of"). The Supreme Court has provided illustrative examples of "but for" causation as follows:

> [W]here A shoots B, who is hit and dies, we can say that A [actually] caused B's death, since but for A's conduct B would not have died." LaFave 467–468 (italics omitted). The same conclusion follows if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back. Thus, if poison is administered to a man debilitated by multiple diseases, it is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived.

*Burrage v. United States*, 571 U.S. 204, 211 (2014). Here, the dust released was a "but for" cause of the alleged breathing problems since the other factors alone, including the Ketom workers' negligence, would not have produced the resulting breathing problems and hospital stay in the absence of the release of the dust. In this way, the facts of this case are different from *Barrett* or *Xytex*: in both of those cases, it was alleged that the substances released combined with other circumstances (including alleged negligent conduct) to create an oxygen-deprived atmosphere that *then* caused the bodily injury at issue. *Barrett*, 696 S.E.2d at 330 (explaining that the complaint did not allege that the inhalation of natural gas caused the injury but rather that the natural gas was allowed to accumulate, that an oxygen-deprived atmosphere was created, and that the lack of oxygen injured Barrett); *Xytex*, 378 F. Supp. 3d at n. 10 & 1290 (noting that the underlying lawsuit alleged that an oxygen-deprived environment caused the injury, also emphasizing that nitrogen is naturally harmless). Thus, under the facts of those cases, there was a question as to whether the oxygen-deprived environments would have existed absent the potentially-benign substances, and therefore a question as to whether those substances were the "but for" causes of the injuries. The circumstance here is not comparable, where Mr. Love's injury without question flows from the release of the dust and its effect on his lungs.

The record and allegations of the complaint demand this conclusion even considering Plaintiff Love Lang's thorough and carefully crafted Consent Judgment, which contains factual findings that the construction dust alone would

not have caused Mr. Love's injuries without the negligence of the Ketom workers and the ensuing dust accumulation. (Consent Judgment at 10-11 ¶ n) (explaining that mere exposure to the dust "would not necessarily be dangerous and would not automatically result in injury to an individual with healthy lungs, and even Mr. Love was not injured merely by simple exposure to the construction dust"). Even accepting this crafted statement of fact as true, it does not save Plaintiff's claims. *See, Burrage*, 571 U.S. at 211 (explaining that a substance "is a but-for cause" of injury "even if" other factors "played a part" in that injury, "so long as, without the incremental effect of the" substance, the injury would not have occurred). In the absence of ("but for") the release of the dust, the workers' alleged negligence would not have caused Mr. Love's breathing problems, harrowing trip to the ICU, and post-hospital trauma under the allegations of the complaint. No question of fact precludes summary judgment on causation here.

### iii.    Whether FCCI had a duty to defend

Count III of the Complaint asserts a claim for "breach of contract—duty to defend." (Compl. ¶¶ 56-68.) Love Lang alleges that FCCI had a duty to defend Ketom in the First and Second Injury Litigations, and also had a duty to defend Whiting-Turner and Seven Fifty as additional insureds but breached those duties, as well as its duty of good faith and fair dealing. (*Id.* ¶¶ 59-61, 63.) In defense, FCCI argues that it investigated the claim and determined it owed no duty to defend because the Total Pollution Exclusion bars coverage under the plain language of the Policy. (Def. Reply at 9-11.)

In Georgia, "an insurer's duty to pay and its duty to defend are separate and independent obligations." *Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc*., 490 S.E.2d 374, 376 (Ga. 1997) (citation omitted). The duty to defend "turns on the language of the insurance contract and the allegations of the complaint asserted against the insured." *City of Atlanta v. St. Paul Fire & Marine Ins. Co*., 498 S.E.2d 782, 784 (Ga. Ct. App. 1998). "[I]t is only where the complaint sets forth true factual allegations showing no coverage that the suit is one for which liability insurance coverage is not afforded and for which the insurer need not provide a defense." *Disabled Am. Veterans*, 490 S.E.2d at 376. If the claim is one for potential coverage, "doubt as to the liability and [the] insurer's duty to defend should be resolved in favor of the insured." *Id.* (internal citations omitted). To excuse the duty to defend, the petition must unambiguously exclude coverage. *Id.*

Here, the Policy in question provides that FCCI:

> will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, **we will have no duty to defend the insured against any "suit" seeking damages … to which this insurance does not apply**.

(FCCI Policy with Ketom at 96) (emphasis added.) As repeated throughout, the Total Pollution Exclusion explains that the insurance does not apply to "bodily injury" "which would not have occurred in whole or in part but for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (*Id.* at 113.) *Ergo*, the duty to defend turns on whether

the original complaint unambiguously alleges that Mr. Love's injuries and damages "would not have occurred in whole or in part but for the ... release or escape" of the dust.

The original complaint in the First Injury Litigation (Doc. 18-2), brought by Mr. Love against a number of entities including Seven Fifty and Whiting-Turner alleges that the construction work being done outside Mr. Love's apartment "resulted in clouds of dust being pumped into his apartment, causing him serious breathing problems, which he complained about several times to the construction crew, who told him there was nothing they could do to stem the tide of the dust." (Original Complaint ¶ 25.) In the sole claim for negligence, Mr. Love alleged that the defendants knew or should have known that the construction work being done was very unsafe and would result in his exposure to dust and that the "dust the work would produce and did produce was particularly dangerous to Mr. Love given his medical condition of end stage emphysema, serious breathing problems and living on oxygen 24/7." (*Id*. ¶ 34(a).)

Plaintiff Love Lang points to other general allegations in the original complaint that assert that the defendants failed to take reasonable precautions, failed to stop an unsafe work environment, and failed to conduct the renovation so as not to cause injury to the elderly and/or disabled persons who lived there. (Pl. Resp. at 22.)[8] But nearly all of these allegations, upon providing specifics, come

---

[8] The Policy's lack of coverage for the daily outputs of construction is only made more upsetting by the fact that the construction was being done in a community of elderly and disabled persons.

back to the dust. (*See e.g., id.* ¶ (h) ("Defendants allowed unsafe renovation work to be done and to continue, even though they knew ... that the dust and exposure to the dust the work produced was harmful..."); ¶ (j) ("Defendants failed to stop the unsafe work, or stop the clouds of dust from going into Mr. Love's apartment..."); (l) ("Defendants failed to consider the effect the clouds of dust being pumped into the apartment would cause to the resident")).

All of the injuries alleged in the original complaint stem from the release of the dust. As reasoned above, without the release of the dust, Mr. Love would not have been injured in the manner described in the complaint. The Court also found above that dust was unambiguously a "pollutant" under the Policy's broad definition. It would be error for the Court to create ambiguity where it does not exist. There is no issue of fact precluding summary judgment for FCCI on Plaintiff's duty to defend claim.

## IV.   Conclusion

The binding legal authority demands the conclusion that "dust" is unambiguously a "pollutant", *i.e.*, an "irritant" or "contaminant" under the "broad definition contained within" the Policy's Total Pollution Exclusion. *Smith*, 784 S.E.2d at 426. In addition, the release of the construction dust, based on the complaint and record, was a "but for" cause of Mr. Love's injuries.   Summary judgment is thus due on Counts I, II, and III. The Court reiterates its discomfort with this conclusion in light of the apparent absurdity of a commercial general insurance policy that does not cover activities associated with an entity's primary

business, the frequency of these pollution exclusion coverage disputes under grim fact scenarios, and the harm suffered by those injured and their families, like Mr. Love and Plaintiff Love Lang. But in light of the explicit authority detailed herein, the Court can do no better. Defendant FCCI's Motion for Partial Summary Judgment [Doc. 19] is **GRANTED** on Counts I, II, and III.


   **IT IS SO ORDERED** this 30th day of March 2021.


_____
**Honorable Amy Totenberg**
**United States District Judge**